IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRY D. HAMILTON, et al.,      ) | CV F 02-6583 AWI SMS |
|      ) | |
|            **Plaintiffs**,      ) | **MEMORANDUM OPINION AND** |
|      ) | **ORDER GRANTING MOTION FOR** |
|        **v.**      ) | **SUMMARY JUDGMENT** |
|      ) | |
|      ) | **ORDER CONCERNING MOTIONS TO** |
|      ) | **STRIKE** |
| HENRY W. WILLMS, et al.,      ) | |
|      ) | **ORDER DENYING MOTION TO** |
|      ) | **CONTINUE** |
|           **Defendants.**      ) | |
| _____ ) | (Documents #329, #365,  #366, & #377) |

This action proceeds on Plaintiffs' second amended complaint.  The court has jurisdiction over the RICO claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.   Pending before the court is Defendants' motion for summary judgment on the first claim for relief.

**PROCEDURAL HISTORY**

This action was filed on July 17, 2002, in the United States District Court for the District of Colorado.  The first amended complaint contained nine claims for relief.  Pursuant to Defendants' motion, on December 11, 2002, the District Court of  Colorado transferred the action to this court.

On June 11, 2003, Plaintiffs filed a second amended complaint.  The first claim alleges a RICO violation pursuant to 18 U.S.C. §§ 1962(c) & 1962(d).   The second claim alleges forbearance on foreclosure agreements concerning California properties.  The third claim alleges breach of contract concerning foreclosures on California properties.  The fourth claim alleges

fraud in relation to a note taken on Colorado Property and is brought under Colorado law.   The fifth claim alleges theft of Colorado Property in violation of Colorado law.   The sixth claim alleges fraud in relation to California property and is brought under California law.   The seventh claim alleges theft regarding JCB's personal property in violation of California law.

On October 27, 2005, Defendants filed a motion for summary judgment on Plaintiffs' first claim for relief.   On November 14, 2005, Plaintiffs filed an opposition.   On November 17, 2005, Defendants filed an objection and motion to strike the opposition as untimely.

On November 28, 2005, the court held a hearing.   Because of Plaintiffs' late opposition, the court give Defendants additional time in which to file a reply brief.

On December 2, 2005, Defendants filed a reply.   Defendants request that the court strike much of the evidence submitted by Plaintiffs in their opposition.

On December 2, 2005, Plaintiffs filed a motion to continue the pending motion for summary judgment pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.   On December 5, 2005, Defendants filed an opposition to Plaintiffs' motion to continue.

On December 12, 2005, Plaintiffs filed an additional opposition to the motion for summary judgment.   Plaintiffs address the evidentiary objections made by Defendants in their reply brief.

On December 13, 2005, Defendants filed a response to Plaintiffs' December 12, 2005 opposition and motion to strike Plaintiffs' December 12, 2005 opposition.

## FACTS[1]

---

[1]   All facts in this statement are being considered for the purposes of this motion only. Simply because the court has considered a fact for the purposes of this motion does not mean the evidence supporting that fact will automatically be admissible in later proceedings.

In opposing Defendants' facts and submitting Plaintiffs' disputed facts, Plaintiffs only cite to exhibits containing many pages of deposition testimony.   "A party opposing summary judgment must direct our attention to specific, triable facts. General references without page or line numbers are not sufficiently specific." Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003) (citations omitted).   In the interest of justice, the court has read the provided portions of the depositions and cited to relevant pages.   When the proposed fact is not supported by the deposition testimony and/or declaration, the court has changed the fact to reflect the evidence.

**A. Undisputed Facts**

Henry Willms and Dolly Willms are co-trustees of the Trust Agreement dated September 26, 1986 ("Trust 1").[2]   Dolly Willms is also the trustee for the Trust Agreement dated December 10, 1982 ("Trust 2").[3]

The second amended complaint alleges three loan transactions that involve nine properties or groups of properties located in California and Colorado.

Two of the three loan transactions alleged in the second amended complaint involved Defendants loaning money to Plaintiffs.

The third loan transaction alleged in the second amended complaint is a note and deed of trust given to Plaintiff Estates in Eagle Ridge, LLP ("Eagle Ridge") by Defendants.

In or about May 2000, Plaintiffs allege Terry and Sharon Hamilton entered into a written loan agreement whereby they borrowed $705,000.00 from Trust 1 and Trust 2.  See Hamilton Dec. at ¶ 13 & 15; Exhibit 5.

In or about October 2000, the Hamiltons allege they entered into a loan agreement whereby they borrowed $750,000.00 from H. Willms, D. Willms, and Trust 1.[4]

On or about May 24, 2001, Defendants caused to be published a Notice of Trustee's sale for the real property located at 1217 South 7th Street, 341-517 West Hatch Road, and 835 North Hart Road, Modesto, California ("Property Group Three").

On or about June 25, 2001, Plaintiffs allege Defendants entered into an oral agreement

---

[2]    It is possible that after 2002, Michael Brotheroton was also a trustee.   At his deposition, Henry Willms was unable to recall if Mr. Brotheroton was made a trustee.

[3]    It is possible that Michael Brotheroton was also a trustee.   At his deposition, Henry Willms was unable to recall the time frame during which Mr. Brotheroton was a trustee of the 1982 Trust.

[4]  Plaintiffs state that while the amended complaint makes this allegation, the lender was Trust 1 and not Willms individually.   However, the cited evidence do not state the entity loaning the money.

with Terry Hamilton, which was fully performed by Terry Hamilton, to postpone the trustee's sale of Property Group Three for one week in exchange for (1) payment by Terry Hamilton of $2,000; (2) a promise by Terry Hamilton not to file bankruptcy, and (3) a promise by Terry Hamilton not to transfer Property Group Three to any third party without the written consent of Trust 1.  ("Agreement 2").

Henry Willms allegedly breached his promise to postpone the trustee's sale of Property Group Three, Agreement 2.

On or about June 25, 2001, Trust 1 conducted the foreclosure sale of Property Group Three.

After the foreclosure sale of Property Group Three on June 25, 2001, and not later than July 2, 2001, Plaintiffs allege Henry and Dolly Willms, on behalf of Trust 1, entered into another oral agreement with Terry Hamilton on behalf of Enviro -Save, Inc. ("ESI") ("Agreement 3"). Under the terms of Agreement 3, the parties allegedly agreed that, among other things, ESI would not attempt to stop the trustee's sale of Property Four in exchange for the right to re-purchase Property Group Three and Property Four after the foreclosure.

On or about July 2, 2001, Property Four was sold at a foreclosure sale.

Lend-Teck Financial, Inc. ("Lend-Teck") is a real estate loan brokerage firm.

Ed Stoermer is a real estate broker licensed by the state of California, and is the broker of record for Lend-Teck.

McClune is a licensed real estate salesperson employed by Lend-Teck.

The parties dispute whether Lend-Teck was the loan broker for Loan One and Loan Three.  The parties dispute who negotiated the loans.   Defendants provide the deposition of Victor McClune.   McClune testified that he formed the real estate brokerage firm Lend-Teck, and that Stoermer is licensed as a broker in California.  See McClune Depo. at 12.   McClune testified that Hamilton was referred to him by Mr. Holtz of Jefferson Financial.  See id. at 35-39. McClune testified regarding Loan 1098 (Loan Three).   McClune testified that he and Hamilton

4

1   meet to discuss Hamilton's proposal to borrow $750,000 to pay off liens that were on property

2   preventing sales.   See id. 82-84.   McClune and Hamilton discussed the length of the loan and

3   properties.   See id. at 85-88.   McClune, Willms, and Hamilton then viewed some of the

4   properties, and they discussed further details of the loans.   See id. at 85-90.   Plaintiffs provide

5   the declaration of Hamilton.   Hamilton states that he discussed the terms of both loans primarily

6   with Willms, and the negotiations for the terms of the loans were with Willms directly.   See

7   Hamilton Dec. at ¶ 13 & 20.   Hamilton states Willms dictated the terms.   See id. at ¶ 6.

8   Hamilton states that while McClune was present, he did not negotiate the loans' terms.   See id.

9   at ¶ 20.   Plaintiffs provide evidence from McClune's deposition that he has a real estate license

10   and has never held a brokers license.   See McClune Depo. at 11.   McClune stated Stoermer

11   provides Lend-Teck with loan servicing, and plays a minimal part in the generation of new

12   business.   See id. at 14-15.   McClune reviews the applications and Stoermer does not review

13   applications; McClune and Stoermer do discuss all loans before they are made.   See id. at 19-21.

14   Plaintiffs provide evidence that neither the Trusts nor either Willms hold brokers' licenses.

15      McClune prepared the notes and deeds of trust.

16      Loan One was serviced by Lend-Teck.   Defendants provide the testimony of McClune.

17   McClune testified that once a loan is funded, the documents are sent to the Freemont office

18   where they set up the account for posting of payments, notices go out, a payment book is

19   generated, and correspondence is set.   See McClune Depo. at 64-65.   While Plaintiffs dispute

20   this fact, Plaintiffs cite to no specific evidence that Willms serviced the loans.   The cited

21   deposition pages only indicate that Willms' daughter, Catherine Lock, enters payments that are

22   received from McClune.   See Willms Trial Test. at 19.   This implies the loan was serviced by

23   Lend-Teck, and Lend-Teck sent payments to Willms.

24      The parties dispute whether Hamilton met with McClune or Willms first to discuss Loan

25   Three.   The parties dispute whether Hamilton presented McClune or Willms with a package

26   outlining Mr. Hamilton's proposal to borrow $750,000 and the security to be pledged.

27

28                                              5

1   McClune testified the loan referral came from Jefferson Financial, and he then met with

2   Hamilton to discuss the loan.  <u>See</u> McClune Depo. at 82-83.   Hamilton states in his declaration

3   that he approached Willms about the bridge loan, gave Willms a package as to how Hamilton

4   would get his obligations paid, and Willms told him to send the package to Holtz at Jefferson

5   Financial.  <u>See</u> Hamilton at ¶ 19.   Hamilton declares that all negotiations were with Willms

6   directly.  <u>See</u> <u>id.</u> at ¶ 20.   While the evidence indicates McClune and Hamilton did discuss Loan

7   Three, there is a disputed issue of fact as to who negotiated the loans' terms with Hamilton.

8        Willms and McClune reviewed the properties to be pledged as security for Loan Three.

9   McClune and Willms discussed the terms of Loan Three.[5]

10        Loan Three was approved.

11        Prior to obtaining Loan One and Loan Three from Defendants, Hamilton was unaware

12   that any of the Defendants had attempted to or collected a debt by extortionate means.   At his

13   deposition, Hamilton testified that he recalled a conversation in which Willms and McClune

14   discussed putting pressure on a borrower.  <u>See</u> Hamilton Depo. at 79-81.   This conversation

15   occurred in the summer of 2001, after the last foreclosure.  <u>See</u> <u>id</u>. at 80-81.   Hamilton testified

16   that he did not recall McClune mentioning threats against other borrows other than this

17   discussion, and that he would not have made the loans had he heard those types of conversations

18   and threats.  <u>See</u> <u>id</u>. at 81.   In his declaration, Hamilton states that during the negotiations for

19   Loan Two, McClune warned Hamilton that Willms had a short temper and that he could cause

20   serious trouble if Hamilton fell behind on payments.  <u>See</u> Hamilton Dec. at ¶ 26.  Before making

21   Loan Three, McClune told Hamilton not to get Willms mad.  <u>See</u> <u>id</u>.   While Plaintiffs have

22   provided evidence that Hamilton was given "warnings" about Willms prior to Loan Three,

23   Plaintiffs have offered no evidence to dispute Hamilton's deposition testimony that he was

24   unaware of Willms' collection practices until after Loan Three was made.

---

[5] Plaintiffs state they dispute this fact.  However, neither Hamilton nor Plaintiffs have any evidence as to what McClune and Willms discussed regarding Loan Three.

1   Citing this same evidence, the parties dispute whether Hamilton's allegations of indirect

2   threats occurred after the last foreclosure.

3   In his discovery response, Terry Hamilton was asked by Lend-Teck to identify each act of

4   mail fraud by Lend-Teck, in which he responded, "As with the question involving wire fraud,

5   Hamilton has only a lay person's understanding of what constitutes mail fraud.  His

6   understanding is that any use of the mails to perpetrate a fraud would be mail fraud.  AT [sic.]

7   this point in the discovery, Hamilton has no specific examples of use of the mails by Lend Teck

8   (TERRY – IS THIS SO?)  However, in order to make the loans and get the transactions

9   completed, the logical assumption is that the mails would be used.  Discovery is continuing."

10  Hamilton is unaware of any threats by Catherine Lock regarding any of the loans in the

11  Second Amended Complaint.

12  Hamilton is similarly unaware of any threats by Dolly Willms regarding any of the loans.

13  Plaintiffs offer no evidence that McClune made a direct threat against Hamilton or his

14  family.   Both Willms and McClune told Hamilton that McClune acted as Willms' "body guard."

15  See Hamilton Dec. at ¶ 29.

16  **B.  Plaintiff's Additional Material Facts**

17  Loan 1091 (Loan One) had a stated interest rate of 14.5%.  See Hamilton Dec. Exhibit 6.[6]

18  Load 1098 (Loan Three) had a stated interest rate of 14.5%.  See Hamilton Dec. Exhibit

19  9.  The Truth in Lending statement for Loan 1098 had a stated annual percentage rate of 25.89%.

20  See Hamilton Dec. Exhibit 11.

21  Neither H. Willms nor D. Willms are licensed real estate brokers.

22  Dolly Willms is the only trustee of Trust 2 (1982 Trust).  See Willms Trial Test. at 11-12.

23  Dolly Willms is the only person authorized to sign for that trust.  See id. at 29.   Willms makes

24

25

26  ───────────

27  [6] While Plaintiffs offer as a fact that the Truth in Lending statement for Loan One placed the annual rate at 25.89%, the cited evidence does not indicate this.

28                                    7

decisions on the Trust.  See id. at 28.[7]   Dolly Willms does not participate in decisions made for either Trust, although she signs documents and accepts money on their behalf.  See id. at 28-29; While Dolly Willms testified that the Trusts made loans through Lend-Teck, Dolly Willms did not know any specifics of the Lend-Teck loans.  See D. Willms Depo. at 27-28.

Edward Stoermer, the broker for Lend-Teck, did not participate in any of the negations for the loans with Hamilton.  See Hamilton Dec. at ¶ 46.[8]

Loan Three was a bridge loan, not a loan to acquire or improve real property.  See Hamilton Dec. at ¶ 19.

Hamilton did not offer either the Hart Road Property or Hatch Road Property as collateral for Loan 3.  See Hamilton Dec. at ¶ 21.   Willms told Hamilton that he wanted these properties for additional protection and that he would not foreclose on these properties.  See id.

Hamilton provides evidence that Willms did all the negotiations as to the terms of the loans with Hamilton.  See Hamilton Dec. at ¶ 6, 13, 20.

Before Loan Three was closed, McClune told Hamilton that Willms had a short temper, that he could cause serious trouble if Hamilton fell behind on payments, and not to get Willms mad at him.  See Hamilton Dec. at ¶ 26.[9]

Willms used the name "Willms Financial," on some correspondence with Hamilton.

Stoermer and McClune do not operate from the same location.

Willms and McClune told Hamilton that McClune acted as Willms' body guard.  See Hamilton Dec. at ¶ 43.

Willms has made at least one other loan with an exorbitant interest rate.   After

---

[7]  While Plaintiffs state that Dolly Willms never granted Willms the authority to sign for Trust 2, it is unclear where in the cited depositions this evidence is contained.

[8]  Plaintiffs stated that Stoermer did not review or prepare any of the documents. However, the cited testimony from McClune's deposition does not state whether Stoermer reviewed or prepared any of the documents for the loans at issue in this action.

[9]  Plaintiffs state that Hamilton took this as a threat.  However, the cited paragraph from Hamilton's declaration does not state this.

negotiating with primarily Willms, Lewis J. "Jim" Westlake was loaned $945,000 at an interest rate of 16% in 1999.  See Westlake Dec. at ¶ 5-6.  The loan was not paid off as agreed, and Willms immediately foreclosed despite Westlake's attempts to work with Willms to resolve the loan.  See id. at ¶ 9-10.  Willms threatened Westlake and his family.  See id. at ¶ 9-10.

Plaintiffs also present evidence from Syed Nawab.  Nawab leased the Country Girl Truck Stop from Catherine Locke, and was told Willms was Locke's manager and agent.  See Nawab at Dec. ¶ 2.  Willms threatened Nawab and interfered with Nawab's business.  See id. at ¶ 4-5. Willms charged Nawab late fees even when rent was paid on time.  See id. at ¶ 6.  To keep his investment in the business and end the problems with Willms, Nawab purchased the property for $1.5 million, even thought its market value was only $450,000.  See id. at ¶ 7-8.  Willms asked Nawab to falsely testify against Hamilton, and implied he would discount the price of the Truck Stop if Nawab testified against Hamilton.  See id. at ¶ 11-13.

Willms left telephone messages on Hamilton's answering machine.  See Hamilton Dec. at ¶ 38.  At times over the telephone and sometimes in person, Willms would tell Hamilton that "the boys back east" were not happy, that he or the boys back east would cause Hamilton's legs to be broken, and told stories about threatening individuals with guns.  See Hamilton Dec. at ¶ 38.  Hamilton took these threats seriously.  See id.  The threats extended over many months, starting in 2001 and carrying into 2002.  See Hamilton Dec. at ¶ 38.

Plaintiffs provide evidence that they believe shows Willms did not credit all payments made by Hamilton.  In February 2001, Hamilton paid $60,000 on Loan 1098.  The payment was applied to principal, but Hamilton thought it would go towards interest.  See Hamilton Dec. at ¶ 27.  On January 16, 2001, Hamilton provided additional collateral for Loan 1098 in the form of a deed of trust on the Leslie Street Property.  See Hamilton Dec. at ¶ 27 & 28.  This collateral was valued at $250,000.  See id.  Willms recorded the deed of trust and sold it to a third party, but never credited it towards Loan 1098.  See id.

After the foreclosures, Willms told Hamilton that he still owed Willms $2 million.  See

1   Hamilton Dec. at ¶ 41.[10]

2       Eagle Ridge owned 38 acres of land, and Hamilton agreed to sell the land to Willms for

3   $497,500.   Part of the purchase price was a promissory note in the amount of $161,852.35.   <u>See</u>

4   Hamilton Depo. at 25.   Willms never paid on the note.   <u>See id</u>.   Neither Hamilton nor Eagle

5   Ridge excused the note.   <u>See id</u>.   The note was surrendered to Willms, but only on conditions that

6   were never met.   <u>See id</u>.   Willms re-recorded the deed in favor of Eagle Ridge.   <u>See id</u>.

7       The negotiations for the loans took place in person and over the phone.   <u>See</u> Hamilton

8   Depo. ¶ 11 & 18.   Some of the documents concerning the loans were sent to Hamilton by

9   McClune through the mail.   <u>See</u> Hamilton Dec. ¶ 6 & 11.

10  **C. Motions to Strike**

11      Defendants have filed motions to strike the declarations of Terry Hamilton, Syed Nawab,

12  and Lewis J. Westlake, which Plaintiffs filed in support of their opposition and statement of

13  disputed facts.   Plaintiffs filed an oppositions to Defendants' motion to strike.

14      Preliminarily, the court notes that Defendants have filed a motion to strike Plaintiffs'

15  opposition to Defendants' motion to strike the declarations.   While the court's order allowing

16  Defendants to file a late reply did not anticipate Plaintiffs filing a response to Defendants' reply,

17  in the interests of justice, the court will consider Plaintiffs arguments on why the court should not

18  grant Defendants' motions to strike the declarations.   Thus, Defendants' motion to strike

19  Plaintiffs' second opposition is denied.

20  ***1.  Hamilton Declaration and Nawab Declaration***

21      The court declines to strike the declarations of Terry Hamilton and Syed Nawab.   The

22  courts recognizes and notes Defendants' objections.   However, as discussed below, even

23  considering all of Plaintiffs' evidence, Defendants are still entitled to summary judgment.   Thus,

24  for the purposes of this motion, the court will consider the Hamilton Declaration and Nawab

25

26      [10] Plaintiffs state this was in excess of the amount due.   Plaintiffs offer no evidence to

27  support this statement.

28                                         10

1   Declaration.   Accordingly, Defendants' motions to strike are denied as unnecessary and moot.

2   ***2.  Westlake Declaration***

3     Defendants object to the Declaration of Lewis J. "Jim" Westlake.   In his declaration,

4   Westlake provides evidence that in 1999 he borrowed $945,000 from Defendants at an interest

5   rate of 16%.   See Westlake Dec. at ¶ 5-6.   Westlake states that while William Holtz and Victor

6   McClune were often present when he negotiated the terms and conditions of the loan, Willms

7   directed the discussions and dictated the loan's terms.   See id. at ¶ 4.   The loan was not paid off

8   as agreed, and Willms immediately foreclosed despite Westlake's attempts to work with Willms

9   to resolve the loan.   See id. at ¶ 9-10.   During the period in which it became clear that the loan

10  would not be paid, Willms threatened Westlake and his family.   See id. at ¶ 8-10.   Willms

11  would threaten physical harm, and he made it clear that bad things might happen if Westlake did

12  not pay Willms back.   See id. at ¶ 8.   Westlake eventually filed bankruptcy, and Willms ended

13  up with significant amounts of property in excess of the amounts Westlake owed.   See id. at ¶ 9.

14  Westlake then leased some of the property from Willms, and stored equipment on the property.

15  See id. at ¶ 10.   In April 2004, Willms evicted Westlake from the property without any legal

16  process, and would not let Westlake remove his equipment.   See id. at ¶ 11-13.   In May 2004,

17  Westlake went to the property with Terry Hamilton, James Bateman, and Syed Nawab to obtain

18  his equipment.   See id.   Tom Forster, who worked with Willms, attacked Westlake.

19    Defendants object to this declaration as a sham.   The only factual allegations necessary to

20  resolve the pending motion are Willms' alleged threats to Westlake during the time Westlake

21  was unable to pay outstanding loans.   As such, the court merely notes Defendants' other

22  objections to Westlake's declaration.  For the purposes of this motion, the court will consider the

23  other aspects of Westlake's declaration because even accepting Westlake's evidence, Defendants

24  are still entitled to summary judgment.  However, it is necessary to the resolution of the pending

25  motion to determine whether the court can consider Westlake's evidence that he was threatened

26  by Willms during the time Westlake was unable to pay amounts owed on outstanding loans.   If

27

28                  11

true, this conduct may establish an act of racketeering.  Defendants ask the court not to consider this evidence because it is a sham.

The general rule is that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir.1991) see also Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 807 (1999). Testimony is a sham only if it flatly contradicts earlier testimony in an attempt to create an issue of fact to avoid summary judgment. Kennedy, 952 F.2d at 267.  Thus, testimony is not a sham if it merely elaborates upon, explains or clarifies prior testimony.  Messick v. Horizon Indust., Inc., 62 F.3d 1227, 1231 (9th Cir.1995).   Contradictory testimony from a witness is not a sham where the witness was confused at the time of the earlier testimony and provides an explanation for the confusion.  Kennedy, 952 F.2d at 266;  Miller v. A.H. Robins Co., 766 F.2d 1102, 1104 (7th Cir.1985).   Finally, contradictory testimony that results from newly discovered evidence is also not a sham.  Kennedy, 952 F.2d at 267.  Thus, before a district court may disregard a contradictory  affidavit, it must make "a factual determination that the contradiction was actually a 'sham.'" Id.

> Certainly, every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. . . . In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition.

Kennedy, 952 F.2d at 266.

Defendants contend that Westlake's declaration about Willms' threats concerning Westlake's outstanding loan is a sham.  Westlake states in paragraphs eight and nine of his declaration that Willms made threats to him and his wife and neighbors during the period of time in which the loan was not being paid off as agreed, it became clear that the loan was not being paid on time, and Westlake started working with Willms and others to take care of the loan. Defendants claim this portion of Westlake's deposition is a sham because it is inconsistent with Westlake's deposition.  At his deposition, Westlake testified as follows:

Q   Okay.   Prior to March 15th, had Mr. Willms ever made any threats against you or your wife?

A   No.

Q   I'm talking at any time since you've known him.

A   He's called my wife at least twice, but I don't - - I need to know how to tie to that April 21st date.   One time he called and said that he really like us, and to "Tell Jim not to trespass" or that he would have us arrested for trespass.   And second time he threatened us with getting the restraining order because I was interfering with the fellows that was stealing my equipment.   So I don't know the proper dates to tie that to, but I can produce that.

Q   So Mr. Willms has never threatened you, personally"

A   Well, if you call my house, leave that message, I took it personal.

Q   Okay.

A   My wife took it personal.

. . . .

Q   Has Mr. Willms ever, in person or by telephone threatened you?

A   I have to go to the phone call that he notified me that he had hired Bear, the enforcer, to keep all the trespassers, including myself, off the property at Dry Creek.   So yes, it was a threat at that time.

Q   And that was a telephone conversation with you?

A   Yes.

Q   So far we have two conversations with wife, your wife, and then one conversation with you where you believe you were threatened by Mr. Willms?

A   Yes.

Q   Any other conversations or meetings, telephone, anything, where you believe Mr. Willms, personally, expressed a threat towards you or your wife?

. . . .

A   I can't recall at this time.

Mr. Pool:   Q   Do you have - - do you believe you have any notes that reflect any threats made to you, personally, by Mr. Willms, other than the three that we have discussed?

A   No.

Q   Are you aware of any documents that would reference any threats that Mr. Willms has made to you, personally, other than the three instances that we just discussed?

A   I believe there was other conversations with other people that threats were made, but - -

Q   I'm not talking about those other people.   We'll get to other people.

A   Okay.

Q   I'm talking about Mr. Willms personally.

A   Oh.   No.

Q   And all of those threats, those alleged threats, occurred after the time that Mr. Willms foreclosed on the property, correct?

A   Mr. Willms never foreclosed on the property.   He bought it with a credit bid . . . .

. . . .

Q   So the Chapter 11 trustee merely sold him the property?

A   Yeah.   They took his credit bid over another bid that had been placed. They gave him the right to buy it with a credit bid.

. . . .

Q   And so since November of '01 it's your understanding that one or more of the defendants have owned the properties that you previously pledged to

13

secure the loans from them, correct?
    A   Yes.
    Q   Since November - - or strike that.
        Prior to November of '01, did Mr. Willms, or any of the other
defendants, make any threats against you?
    A   No
    Q   Between - -
    A   Not to my knowledge.
    Q   That's all I'm asking.   I'm not asking you to guess what someone else
might have known.
. . . .
        Mr. Pool:   Q   Mr. Westlake, are you aware of any threats that Mr. Willms
made against you, personally, in your presence, prior to March 15, 2004.
    A   No.
    Q   And after March 15, 2004, the only threats of which you're aware are
three: The two that were left with your wife, and the one telephone conversation
with you?
    A   Yes

See Westlake Depo. at 80-86.   Westlake' deposition clearly states that prior to November 2001,

the date of the sale from Mr. Westlake's Chapter 11 Trustee to Willms, neither Willms nor any

other Defendant had made any threats against Westlake.   See Westlake Depo. at 85.   After

March 15, 2004, Westlake described three threats concerning trespassing.   See id. at 80-82.

Westlake could not recall any other threats toward Westlake or his wife.   See id. at 82.

        Westlake's declaration conflicts with his deposition.   Westlake's declaration describes

threats made by Willms when Westlake became unable to pay on the outstanding loan.   This

would have presumably been before Westlake filed for bankruptcy and his property was sold by

the Bankruptcy Trustee.   The only threats described in the deposition are threats made after

Willms owed the property and concern Westlake's alleged trespassing.   Nothing in the

deposition describes threats concerning an outstanding loan.   Thus, the declaration is clearly

contrary to the deposition.

        In Plaintiffs' opposition to the motion to strike, Plaintiffs contend that Westlake's

deposition is not contrary to his deposition.   Plaintiffs claim that Westlake is 65 years old.

Plaintiffs point out that Westlake only stated he could not recall other threats.   Plaintiffs argue

that it is not uncommon for a person to not be able to recall every fact.   The Ninth Circuit has

1   noted that, before disregarding a declaration because of inconsistencies with a deposition, the

2   district court first must make a factual determination that the contradiction is actually a sham.

3   The court makes that finding here.   Westlake's declaration regarding threats pertaining to

4   outstanding loans is wholly inconsistent with his deposition testimony.   Westlake offers no

5   explanation for the discrepancy.   Plaintiffs' attorney's explanation, that it is not uncommon for a

6   65 year old witnesses to forget facts, is entirely unreasonable without Westlake himself

7   explaining why he forgot the threats concerning the outstanding loan during his deposition.

8   Nothing in Westlake's declaration legitimately elaborates upon, explains, or clarifies his prior

9   testimony.   Instead, Westlake's declaration offers no information about Westlake's prior

10  testimony and offers no explanation for any differences.   Ninth Circuit law does not permit

11  witnesses to change their testimony this substantially without an explanation from the witness.

12  The court finds it has no choice but to find those portions of Westlake's deposition concerning

13  Willms' alleged threats regarding Westlake's outstanding loan to be a "sham," inconsistent with

14  his own deposition.   Without any explanation from Westlake explaining his differing testimony,

15  the court cannot find the inconsistency is minor and the result of an honest discrepancy, a

16  mistake, or newly discovered evidence.   See Messick v. Horizon Indus. Inc., 62 F.3d 1227, 1231

17  (9th Cir.1995).   The court finds Westlake's declaration regarding Willms' threats concerning

18  outstanding loans inadmissible under Federal Rules of Evidence 702 and 704 and strikes the

19  declaration accordingly.

20                **MOTION TO STRIKE UNTIMELY OPPOSITION**

21       Defendants contend that the court should strike Plaintiffs' opposition because it was not

22  timely served.   Local Rule 78-230(c) provides:

23       (c) Opposition and Non-Opposition. Opposition, if any, to the granting of the
         motion shall be in writing and shall be filed with the Clerk not less than fourteen
24       (14) days preceding the noticed (or continued) hearing date. Opposition shall be
         personally on opposing counsel not less than fourteen (14) days preceding the
25       hearing date (personal service) or mailed or electronic service not less than
         seventeen (17) days preceding the hearing date. . . . .   No party will be entitled to
26       be heard in opposition to a motion at oral arguments if opposition to the motion
         has not been timely filed by that party.

27

28                                    15

1

2   Defendants claim that Plaintiffs filed and served their opposition and supporting documents on

3   Monday, November 14, 2005, fourteen days before the hearing.   Plaintiffs have not filed a proof

4   of service indicating service of the opposition.   As such, it appears Plaintiffs served Defendants

5   electronically at the same time Plaintiffs filed the opposition with the court.   Defendants confirm

6   that they received the opposition electronically on November 14, 2005.   Pursuant to Local Rule

7   78-230(c) an opposition shall be mailed or electronically serviced not less than seventeen days

8   preceding the hearing date.

9          The court declines to strike Plaintiffs' opposition.   The remedy for any late opposition in

10  the Local Rules is to not allow the opposing party to be heard at oral arguments.   <u>See</u> Local Rule

11  78-230(c).   Nothing in the Local Rules nor the Federal Rules of Civil Procedure requires the

12  court to strike an opposition that is served late.   And, the court declines to strike the opposition

13  here.   The court allowed Defendants time to file a late reply in response to the late opposition.

14  Thus, Defendants have not been prejudiced by the late opposition.   Accordingly, Defendants'

15  motion to strike is denied.

16  **LEGAL STANDARD FOR SUMMARY JUDGMENT**

17         Summary judgment is appropriate when it is demonstrated that there exists no genuine

18  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

19  Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Poller v.</u>

20  <u>Columbia Broadcast System</u>, 368 U.S. 464, 467 (1962); <u>Jung v. FMC Corp.</u>, 755 F.2d 708, 710

21  (9th Cir. 1985); <u>Loehr v. Ventura County Community College Dist.</u>, 743 F.2d 1310, 1313 (9th

22  Cir. 1984).

23              Under summary judgment practice, the moving party
                [A]lways bears the initial responsibility of informing the district
24              court of the basis for its motion, and identifying those portions of
                "the pleadings, depositions, answers to interrogatories, and
25              admissions on file, together with the affidavits, if any," which it
                believes demonstrate the absence of a genuine issue of material
26              fact.

27

28                                      16

1    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

2    burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

3    in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

4    file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and

5    upon motion, against a party who fails to make a showing sufficient to establish the existence of

6    an element essential to that party's case, and on which that party will bear the burden of proof at

7    trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the

8    nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a

9    circumstance, summary judgment should be granted, "so long as whatever is before the district

10   court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

11   satisfied."  Id. at 323.

12        If the moving party meets its initial responsibility, the burden then shifts to the opposing

13   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

14   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities

15   Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280

16   (9th Cir. 1979), cert. denied, 455 U.S. 951 (1980).    In attempting to establish the existence of

17   this factual dispute, the opposing party may not rely upon the mere allegations or denials of its

18   pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or

19   admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e);

20   Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d

21   747, 749 (9th Cir. 1973).   In the endeavor to establish the existence of a factual dispute, the

22   opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient

23   that "the claimed factual dispute be shown to require a jury or judge to resolve the parties'

24   differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809

25   F.2d at 631.

26

27

28                                              17

**MOTION FOR A CONTINUANCE PURSUANT TO RULE 56(f)**

At the hearing, Plaintiffs stated for the first time that they would like the court to delay ruling on the pending motion for summary judgment until the deposition of Suzanne Conry can be taken.    Because this was a new request, the court informed Plaintiffs that they needed to file a formal motion.    Plaintiffs then filed a motion to continue the motion for summary judgment pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.    Defendants oppose this motion.

Rule 56(f) allows the court to deny or continue a motion for summary judgment to allow the opposing party additional time to oppose a motion.  Rule 56(f) provides as follows:

> (f) When Affidavits are Unavailable.  Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The Ninth Circuit has explained that in order to prevail on a Rule 56(f) motion, the party "must show (1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion." State of California v. Campbell, 138 F.2d 772, 779 (9th Cir. 1998).  The burden is on the party seeking to conduct additional discovery to put forth sufficient facts to show that the evidence sought exists.    Volk v. D. A. Davidson & Co., 816 F.2d 1406, 1416 (9th Cir. 1987).    The Ninth Circuit reviews a court's decision not to permit additional discovery pursuant to Rule 56(f) for abuse of discretion.  Nidds v. Schindler Elevator Corp., 113 F.3d 912, 920 (9th Cir. 1996).

> "Moreover, the district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past." Id. (citing Conkle v. Jeong, 73 F.3d 909, 914 (9th Cir.1995)). Stated another way, "[w]e will only find that the district court abused its discretion if the movant diligently pursued its previous discovery opportunities, and if the movant can show how allowing additional discovery would have precluded summary judgment." Byrd v. Guess, 137 F.3d 1126, 1131 (9th Cir.1998).

Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1161 n.6 (9th Cir. 2001).

**A. Deposition of Suzanne Conry and Henry Willms Regarding Cheyenne**

Plaintiffs provide the declaration of their attorney, David M. Gilmore, in support of their motion. Mr. Gilmore states that the deposition of Ms. Conry still needs to be taken, and the deposition of Mr. Willms needs to be concluded about issues that will be raised in Ms. Conry's deposition. Ms. Conry is a representative of Cheyenne Development Company. In the second amended complaint, Plaintiffs allege that Plaintiffs' company, Estates in Eagle Ridge, sold Colorado property to Willms and Defendants subject to a note and lien on the property. Plaintiffs then sold this note to Cheyenne. A dispute arose in Colorado on whether the note was valid. A settlement was reached between Defendants and Cheyenne. The pending deposition of Ms. Conry concerns the dispute.

Mr. Gilmore states that Ms. Conry will provide the following evidence: (1) Information about disturbing messages from Willms left on her answering machine; (2) Willms made references to Ms. Conry about the "boys back east" and other phrases that Ms. Conry took as threats; (3) Ms. Conry's knowledge of the threats Willms made against Hamilton; (4) Willms false representations to Ms. Conry regarding Hamilton, which led to the legal dispute in Colorado and resulted in damage to Hamilton's and Cheyenne's relationship; (5) Lies Willms made under oath in the Colorado action, such as inconsistent positions over the note owned to Hamilton; (6) Documents relating to the transactions between Hamilton and Willms; and (7) Why Cheyenne entered into the confidential settlement agreement with Willms. Plaintiffs argue Ms. Coney's testimony will go to Mr. Willms' lack of credibility, the background regarding the Colorado property sold to Defendants, and Defendants pattern of racketeering activity.

"Ordinarily, summary judgment should not be granted when there are relevant facts remaining to be discovered, but the party seeking a continuance bears the burden to show what specific facts it hopes to discover that will raise an issue of material fact." Continental Maritime v. Pacific Coast Metal Trades, 817 F.2d 1391, 1395 (9th Cir. 1987). Rule 56(f) requires that the party seeking the continuance show that the missing facts are essential to resist the summary

19

1  judgment motion.   <u>Campbell</u>, 138 F.3d st 780.    Plaintiffs have failed to show that the facts

2  they hope to elicit during the deposition of Ms. Conry are essential to resisting Defendants'

3  motion for summary judgment on the RICO claim.

4        As is discussed more throughly below, of paramount importance in this motion for

5  summary judgment is Plaintiff's evidence that Defendants engaged in a pattern of racketeering

6  conduct.   Specially, the court needs to review the specific racketeering acts that Defendants

7  allegedly engaged in and conclude whether these acts constituted a pattern.    Title 18 U.S.C.

8  1961(1) lists the specific acts that can constitute racketeering activity.    However, Plaintiffs have

9  not alleged which of the acts listed in Section 1961(1) Ms. Conry's testimony will show

10  Defendants committed.   Section 1961(1) does include threats, but only if they involve murder,

11  kidnaping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a

12  controlled substance.   Plaintiffs provide no evidence the alleged threats Ms. Conry will testify

13  about involved murder, kidnaping, gambling, arson, robbery, bribery, extortion, dealing in

14  obscene matter, or illegal drugs.   Section 1961(a) includes extortionate credit transactions.

15  However, the Colorado property deal concerning Cheyenne includes allegations that Defendants

16  owed Plaintiffs money on a note, which Plaintiffs sold to Cheyenne.   Because Defendants were

17  the borrowers, the transactions Ms. Conry will testify about cannot be extortionate credit

18  transactions.   Section 1961(a) also states racketeering acts can include mail fraud, wire fraud,

19  financial institution fraud, obstruction of justice and criminal investigations, witness tampering,

20  and interstate travel in aid of racketeering enterprises.   Plaintiffs have failed to show Ms. Conry

21  testimony will establish Defendants committed any of these offenses.

22         District courts have the discretion to deny further discovery "if the movant fails to show

23  how the information sought would preclude summary judgment."   <u>Employers Teamsters Local</u>

24  <u>Nos. 175 and 505 Pension Trust Fund v. Clorox Co.</u>,  353 F.3d 1125, 1130 (9th Cir. 2004)

25  (quoting <u>Cal. Union Ins. Co. v. Am. Diversified Sav. Bank</u>, 914 F.2d 1271, 1278 (9th Cir.1990).

26  Here, Plaintiffs have failed to show that Ms. Conry's testimony will show another racketeering

27

28                                                      20

1    act, committed by Defendants, that will help to establish a pattern of racketeering.   In light of the

2    specific acts that constitute racketeering, Plaintiffs' general allegation that Ms. Conry's testimony

3    will show a pattern of racketeering is insufficient.   It is not this court's responsibility to search

4    the record sua sponte for some genuine issue of material fact that Ms. Conry will provide that

5    will defeat summary judgment.   Cf Contreras v. Corinthian Vigor Ins. Brokerage, Inc., 103

6    F.Supp.2d 1180, 1183 (N.D. Cal. 2000) (on summary judgment district court not required to

7    search the record sua sponte for issues of material fact).   Nothing in Ms. Conry's proposed

8    testimony clearly indicates a racketeering act that is so obvious to the court that the court can

9    presume Ms. Conry's testimony will establish additional racketeering acts despite Plaintiffs'

10   failure to specifically cite them.   Thus, the court finds Plaintiffs have not meet their burden to

11   show that the court should delay ruling on the pending motion for summary judgment.

12   **B. Additional Documents**

13          Mr. Gilmore also states a continuance is needed to give Plaintiffs more time to obtain

14   documents.  In his deposition, Willms referenced to documents that are not in Plaintiffs'

15   possession.  Willms testified that he had documents relating to the loans at his house.   Willms

16   also referred to a letter concerning his agreement with Hamilton to repurchase the Hart Road

17   Property.

18          Plaintiffs have failed to explain how additional documents regarding the loans would help

19   them defeat the pending motion for summary judgment.   It is unclear to the court how additional

20   documents about the loans will assist Plaintiffs in establishing racketeering acts.  The court has

21   already considered the existence of the loans and Defendants conduct regarding the loans to

22   determine if Defendants engaged in racketeering acts.   While additional evidence regarding the

23   loans and possible agreements to re-sell property might assist Plaintiff in their claims for fraud

24   and forbearance, Plaintiffs have failed to show how this information is relevant to defeat the

25   RICO claim.  Thus, the court finds Plaintiffs have not meet their burden to show why the court

26   should delay ruling on the pending motion for summary judgment because Willms has not

27

28                                                    21

1    provided Plaintiffs with documents concerning the loans.

2    **C. Michael Brotheroton**

3           Finally, Mr. Gilmore states a continuance is needed to give them more time to obtain the

4    possible testimony of Mr. Brotheroton.   During his deposition, Willms testified that Mr.

5    Brotheroton might have been another trustee of the Trusts.  Plaintiffs claim that they had never

6    heard about Mr. Brotheroton before Mr. Willms' September 21, 2005 deposition.   Plaintiffs

7    argue that if Mr. Brotheroton was the trustee for the Trusts during the time the loans were made,

8    Willms might have lacked authority to act on behalf of the Trusts and the loans are voidable.

9           Again, Plaintiffs have failed to show how the testimony of Mr. Brotheroton could show

10   further acts of racketeering by the named Defendants.   While Mr. Brotheroton's legal status with

11   the Trusts at the relevant times might be of interest to determine Plaintiffs' potential remedies

12   regarding the status of the loans and Plaintiffs' state law claims, the court sees no obvious

13   racketeering act even assuming Mr. Willms did not have authority to act on behalf of the Trusts

14   at all times relevant to this action.  Plaintiffs have not met their burden to show that the court

15   should delay ruling on the pending motion for summary judgment in light of evidence regarding

16   Mr. Brotheroton being a possible additional trustee.

17   **D. Untimely Motion**

18          Further, the court finds that Plaintiffs' motion must be denied because it is untimely.

19   Factors courts have considered in granting motions pursuant to Rule 56(f) include: (1) the

20   summary judgment motion was made early in the litigation and before relevant discovery could

21   be completed; (2) the discovery was stayed by court order; (3) the case involved complex facts

22   requiring additional discovery; (4) the material facts are within the exclusive knowledge of the

23   moving party; (5) discovery requests are currently outstanding to the moving party; and (6)

24   the motion raises new and unanticipated issues.  See Schwarzer, Tashima, Wagstaffe, Cal.

25   Practice Guide: Fed.Civ.Pro. Before Trial, § 14:115 (The Rutter Group 2005) (citing Garrett v.

26   San Francisco, 818 F.2d 1515 (9th Cir. 1987), DiMartini v. Ferrin, 889 F.2d 922  (9th Cir. 1989),

27

28                                                22

1   and <u>Weir v. Anaconda Co.</u>, 773 F2d 1073 (10th Cir. 1985)).   Here, Plaintiffs have always known

2   they would need to establish a pattern of racketeering activity to prove their RICO claim.

3   Plaintiffs were aware of the Cheyenne loan to Defendants because Plaintiffs originally made this

4   loan and allegations regarding it are in the complaint.   While it does appear some of the delay

5   concerning Ms. Conry's deposition is due to litigation regarding a protective order, the court has

6   repeatedly found Plaintiffs have not been diligent in conducting discovery.   In addition,

7   Plaintiffs choose to depose Mr. Willms on the eve of this summary judgment motion.   While

8   scheduling delays may account for a few weeks or even months of delay in deposing Mr. Willms,

9   this action was filed in July 2002.   Plaintiffs have never offered a clear explanation for their

10  failure to depose Mr. Willms, the alleged mastermind behind everything that happened, earlier.

11  In light of Plaintiffs' lack of diligence in conducting discovery in this case, the court declines to

12  delay this case further.   A district court only abuses its discretion to deny a Rule 56(f) request if

13  the plaintiff has diligently pursued discovery opportunities.   <u>Chance v. Pac-Tel Teletrac Inc.</u>, 242

14  F.3d 1151, 1161 n.6 (9th Cir. 2001).

15          Finally, Plaintiffs did not timely file their Rule 56(f) motion.  Plaintiffs did not file a Rule

16  56(f) request or note any need for Ms. Conry's deposition, additional loan documents, and Mr.

17  Brotheroton's deposition at the time their opposition was due or filed.   It was not until Plaintiffs

18  filed their opposition, Defendants filed their motion to strike, and the court held a hearing on

19  Defendants' motion that Plaintiffs' first raised the issue of a continuance.   There is no reason

20  why Plaintiffs would not have known about the need for Ms. Conry's deposition and Willms'

21  additional documents at the time they were opposing Defendants' motion.   Thus, Plaintiffs'

22  motion to continue the motion for summary judgment can be denied on its face because it is

23  untimely.

24          **MOTION FOR SUMMARY JUDGEMENT ON THE RICO CLAIM**

25          Defendants request summary judgment on Plaintiffs' first claim, which alleges a violation

26  of RICO.  The substantive RICO statute is 18 U.S.C. § 1962.  That statute prohibits four types of

27

28                                                  23

1  activities, which are set forth in subsections (a), (b), (c), and (d).  18 U.S.C. § 1962(a) prohibits

2  investing income derived from a pattern of racketeering in an "enterprise."  Section 1962(b)

3  prohibits acquiring or maintaining an interest in an enterprise by means of a pattern of

4  racketeering activity.  Section 1962(c) prohibits conducting the affairs of an enterprise through a

5  pattern of racketeering activity.  Section 1962(d) prohibits conspiracies involving any or all of the

6  other three specific prohibitions.   Despite the pending parties' briefs, the second amended

7  complaint states that the RICO claim is based on Sections 1962(c) and Section 1962(d).   The

8  court has found in prior orders that the RICO claim is based on Sections 1962(c) and Section

9  1962(d).  Thus, it is only necessary to address Plaintiff's RICO claim based on Sections 1962(c)

10  and Section 1962(d).

11    Title 18 U.S.C. § 1962(c) prohibits a person from engaging in a pattern of racketeering

12  while operating or managing an "enterprise."

13     It shall be unlawful for any person employed by or associated with any enterprise
   engaged in, or the activities of which affect, interstate or foreign commerce, to
14     conduct or participate, directly or indirectly, in the conduct of such enterprise's
   affairs through a pattern of racketeering activity or collection of unlawful debt.
15

16  18 U.S.C. § 1962(c).   To state a civil RICO claim, a plaintiff must prove "(1) conduct (2) of an

17  enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiffs'

18  'business or property.'"   Ove v. Gwinn, 264 F.3d 817, 825 (9th Cir. 2001).   Section 1962(d)

19  prohibits conspiracies to engage in violations of Section 1962(c).  See 18 U.S.C. § 1962(d).

20  **A. Enterprise**

21    Defendants contend that Plaintiffs are entitled to summary judgment because the facts do

22  not show an enterprise.   Title 18 U.S.C. § 1961(4) defines an enterprise as "any individual,

23  partnership, corporation, association, or other legal entity, and any union or group of individuals

24  associated in fact although not a legal entity."   According to the Supreme Court, "establishing

25  the existence of an associated-in-fact enterprise requires proof (1) of an ongoing organization,

26  formal or informal, and (2) that the various associates function as a continuing unit."   Chang v.

27

28                24

1   Chen, 80 F.3d 1293, 1297 (9th Cir. 1996) (citing United States v. Turkette, 452 U.S. 576, 580

2   (1981)).   The enterprise element requires the organization, formal or informal, to be an entity

3   separate and apart from the pattern of racketeering activity in which it engages.   Chang, 80 F.3d

4   at 1298.   That is, a RICO enterprise "at a minimum ... must exhibit 'some sort of structure . . .

5   for the making of decisions, whether it be hierarchical or consensual.' The structure should

6   provide 'some mechanism for controlling and directing the affairs of the group on an on-going,

7   rather than an ad hoc, basis.'" Id. at 1299.   To be an enterprise, an association must have "an

8   existence beyond that which is merely necessary to commit the predicate acts of racketeering."

9   Id.   "A group whose members collectively engage in an illegal act, in-and-of-itself, does not

10  constitute an 'enterprise' for the purposes of RICO."   Simon v. Value Behavioral Health, Inc.,

11  208 F.3d at 1083.[11]

12          Here, Plaintiffs have not cited the court to specific facts either directly showing an

13  enterprise or providing circumstantial evidence of an enterprise.   A party opposing summary

14  judgment must direct the court to specific, triable facts, and general references without page or

15  line numbers are not sufficiently specific.   Southern California Gas Co. v. City of Santa Ana,

16  336 F.3d 885, 889 (9th Cir. 2003) (citations omitted).   It is unfair to the district court, to other

17  litigants, and to the movant to impose a duty on the district court to "search and sift the factual

18  record for the benefit of a defaulting party."   Carmen v. San Francisco Unified Sch. Dist., 237

19  F.3d 1026, 1030-31 (9th Cir. 2001).   The failure of the plaintiff to define the parameters of the

20  enterprise is fatal to a RICO claim.   See, e.g., Otto v. Variable Annuity Life Ins., 814 F.2d 1127,

21  1136 (7th Cir.1986) ("We affirm the dismissal of the RICO count for failure to identify the

22

23          [11]   The Ninth Circuit has rejected a definition of enterprise "to permit the organization
    constituting the enterprise to be no more than the sum of the predicate racketeering acts" for three
24  reasons.   Chang, 80 F.3d at 1298.   First, the Ninth Circuit found that such an approach would
    effectively render the enterprise element superfluous, because every pattern of racketeering
25  activity becomes an enterprise whose affairs are conducted through the pattern of racketeering
    activity.   Id.   Second, the Ninth Circuit found that such an approach "would strip RICO of its
26  focus on organized crime by ignoring the organizational nexus at the heart of the RICO scheme."
    Id. at 1298-99.   Finally, the Ninth Circuit found that such an approach would make section
27  1962(d), which prohibits conspiracies to violate section 1962(c), meaningless.   Id. at 1299.

28                                                      25

1    enterprise"); <u>Richter v. Sudman</u>, 634 F.Supp. 234, 240 (S.D.N.Y.1986) (failure to identify the

2    enterprise provides a basis to dismiss the RICO claims).

3            Plaintiffs have not cited to any specific facts by page number.  However, even reading the

4    depositions and declarations to create Plaintiffs' disputed facts as cited above, the evidence is

5    insufficient to show an enterprise.   Plaintiffs have provided evidence that the Trusts made two

6    loans to Plaintiffs.   Some person or entity loaned money to Westlake.   The terms of all three

7    loans were negotiated by Willms.   Dolly Willms is a trustee for both Trusts, and the only trustee

8    for the 1982 Trust.   Dolly Willms signed papers, but did not make decisions regarding the

9    Trusts.   McClune was Willms' "bodyguard."   McClune did paperwork for Plaintiffs' loans.

10   Lend-Teck serviced Plaintiffs' loans, and the loans were made through Lend-Teck.   Willms

11   negotiated the terms of the loans, Willms threatened Plaintiffs and Westlake, and Willms appears

12   to have made the decision to foreclose on the properties securing the loans.   These are the facts

13   Plaintiffs have cited to the court.

14           Plaintiffs' have failed to allege in their opposition or provide facts showing an enterprise

15   apart from the racketeering acts.  The only specific facts presented to the court involve three

16   loans, all of which appear to also be alleged predicate acts of racketeering.   While Plaintiffs

17   allege other loans, Plaintiffs have failed to provide citation to evidence of other loans.   If the

18   court searched the record, the court could possibly find additional evidence indicating a potential

19   enterprise.  However, all Plaintiffs have cited the court to is evidence of three loans, how

20   Defendants foreclosed on the properties securing two of the loans, and threats.   This is

21   insufficient to establish an enterprise.   Plaintiffs may not rely upon allegations in opposing

22   Defendants' motion for summary judgment, and they are required to tender admissible evidence

23   in support of their contentions.  <u>See</u>  Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11; <u>First Nat'l</u>

24   <u>Bank</u>, 391 U.S. at 289.  Plaintiffs have failed to provide sufficient evidence to create a disputed

25   issue of material fact on whether Defendants were an enterprise.

26

27

28

1  **B. Racketeering Activity**

2        Defendants contend that they are entitled to summary judgment because Plaintiffs have

3  failed to provide evidence of racketeering activity.   RICO violations under § 1962(c) require a

4  "pattern of racketeering activity." 28 U.S.C. § 1962(c).   The RICO statute defines a "pattern of

5  racketeering activity" to be "at least two acts of racketeering activity, one of which occurred

6  within ten years (excluding any period of imprisonment) after the commission of a prior act of

7  racketeering activity." 18 U .S.C. § 1961(5).

8        Among other things, 18 U.S.C. § 1961(1) defines "racketeering activity" as:

9      (A) any act or threat involving murder, kidnaping, gambling, arson, robbery,
    bribery, extortion, dealing in obscene matter, or dealing in a controlled substance
10     or listed chemical (as defined in section 102 of the Controlled Substances Act),
    which is chargeable under State law and punishable by imprisonment for more
11     than one year;
    (B) any act which is indictable under any of the following provisions of title 18,
12     United States Code: . . . sections 891-894 (relating to extortionate credit
    transactions), . . . section 1341 (relating to mail fraud), section 1343 (relating to
13     wire fraud), . . . section 1512 (relating to tampering with a witness, victim, or an
    informant), section 1513 (relating to retaliating against a witness, victim, or an
14     informant), . . . section 1951 (relating to interference with commerce, robbery, or
    extortion), section 1952 (relating to racketeering) . . . .
15 . . . .

16 18 U.S.C. § 1961(a).   From the opposition, it is not entirely clear what conduct Plaintiffs

17 believe constitutes Defendants' racketeering activities.   The parties discuss the following alleged

18 racketeering activities in their briefs: Extortionate credit transactions; Collection of an extension

19 of credit by extortionate means; Mail fraud; and Wire fraud.  Thus, the court will proceed on

20 these theories.

21 *1.  Extortionate Credit Transactions*

22       As discussed above, racketeering activity includes any act indictable under certain

23 enumerated federal criminal statutes, including 18 U.S.C. § 892, which makes extortionate credit

24 transactions a criminal offense.  Title 18 U.S.C. § 892 provides in part:

25     (b) In any prosecution under this section, if it is shown that all of the following
    factors were present in connection with the extension of credit in question, there is
26     prima facie evidence that the extension of credit was extortionate . . .:
        (1) The repayment of the extension of credit, or the performance of any

27

28                         27

promise given in consideration thereof, would be unenforceable, through civil judicial processes against the debtor
     (A) in the jurisdiction within which the debtor, if a natural person, resided or
     (B) in every jurisdiction within which the debtor, if other than a natural person, was incorporated or qualified to do business at the time the extension of credit was made.
(2) The extension of credit was made at a rate of interest in excess of an annual rate of 45 per centum calculated according to the actuarial method of allocating payments made on a debt between principal and interest, pursuant to which a payment is applied first to the accumulated interest and the balance is applied to the unpaid principal.
(3) At the time the extension of credit was made, the debtor reasonably believed that either
     (A) one or more extensions of credit by the creditor had been collected or attempted to be collected by extortionate means, or the nonrepayment thereof had been punished by extortionate means; or
     (B) the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof.
(4) Upon the making of the extension of credit, the total of the extensions of credit by the creditor to the debtor then outstanding, including any unpaid interest or similar charges, exceeded $100.

18 U.S.C. § 892.

*a. Enforcement*

Plaintiffs contend that the loans are not enforceable through the civil process because they were made at usury rates of interest.   Section 1 of Article XV of the California Constitution provides that loans shall not be made at a rate exceeding 10 percent per annum.   Both loans made to Plaintiffs and the loan made the Westlake were at interest rates above 10 percent.

Defendants contend that they are not subject to usury limitations, making the loans enforceable.   Defendants rely on California Civil Code § 1961.1, which provides an exception to the usury rate for loans or forbearances made or arranged by any person licensed as a real estate broker by the State of California that are secured, directly or collaterally, in whole or in part by liens on real property.   Section 1961.1 states that a loan or forbearance is arranged by a person licensed as a real estate broker when the broker:

(1) acts for compensation or in expectation of compensation for soliciting, negotiating, or arranging the loan for another, (2) acts for compensation or in expectation of compensation for selling, buying, leasing, exchanging, or negotiating the sale, purchase, lease, or exchange of real property or a business for

another and (A) arranges a loan to pay all or any portion of the purchase price of, or of an improvement to, that property or business or (B) arranges a forbearance, extension, or refinancing of any loan in connection with that sale, purchase, lease, exchange of, or an improvement to, real property or a business, or (3) arranges or negotiates for another a forbearance, extension, or refinancing of any loan secured by real property in connection with a past transaction in which the broker had acted for compensation or in expectation of compensation for selling, buying, leasing, exchanging, or negotiating the sale, purchase, lease, or exchange of real property or a business. The term "made or arranged" includes any loan made by a person licensed as a real estate broker as a principal or as an agent for others, and whether or not the person is acting within the course and scope of such license.

Cal. Civ. Code § 1961.1.

Plaintiffs contend that Section 1961.1 does not apply because the only person with a broker's license, Stoermer, did nothing to arrange the loans.   A loan is "arranged" by a real estate broker when the broker causes a loan to be obtained or procured, "which includes structuring the loan as the agent for the lender, setting the interest rate and points to be paid, setting the terms of the forbearance agreement, reviewing the loan and forbearance documents, conducting title searches, or drafting the terms of the loan."   Gibbo v. Berger, 123 Cal.App.4th 396, 402 (2004).   The California courts have found a licensed real estate broker "arranged" loans for a real estate partnerships, within meaning of statute, when, acting as an intermediary, he negotiated loans for each partnership's benefit, not merely for his own, and was given right to participate in partnership profits as the expected compensation for his efforts.   Park Terrace Limited v. Teasdale, 100 Cal.App.4th 802 (2002).   The California courts have found a licensed real estate broker "arranged" a loan when the broker conducted a title search, reviewed documents, consulted, advised, calculated the principal and interest, prepared the loan documents, discussed the documents and terms with the lender and the borrower, and secured execution of the documents.   Del Mar v. Caspe, 222 Cal.App.3d 1316 (1990).

There is a disputed issue of fact on who arranged the loans.   Taking the evidence in the light most favorable to Plaintiffs, neither Stoermer nor McClune, acting as Stoermer's agent, sufficiently arranged the loans to fall within Section 1961.1's exception to usury.   There is undisputed evidence that Stoermer and McClune discussed loans before they are made through

Lend-Teck.   And, presumably, they discussed the loans made to Plaintiffs.   McClune prepared the paperwork for the loans.   Lend-Teck serviced the loans.   However, based on the case authority, this evidence is insufficient to show that Stoermer and Lend-Teck "arranged" the loans.   Plaintiffs provide evidence that Willms negotiated the loans and Willms dictated the loans' terms.   Defendants cite no authority indicating that discussing a loan with a co-worker, signing loan documents, and servicing a loan are sufficient to have "arranged" a loan.   Thus, taking Plaintiffs' evidence in the light most favorable to Plaintiff, Section 1961.1 does not apply, and the loans at issue may be unenforceable because of the high interest rates.

*b.  Plaintiffs' Knowledge*

Defendants next contend that Plaintiffs have not shown that they believed Defendants had a reputation for or had used extortionate methods to collect debts at the time the loans were made.   Section 892(b) requires that at the time the loan was made "the debtor reasonably believed that either (A) one or more extensions of credit by the creditor had been collected or attempted to be collected by extortionate means, or the nonrepayment thereof had been punished by extortionate means; or (B) the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof."   18 U.S.C. § 892(b)(3).

The undisputed facts show that Loan One and Loan Three were made in May and October 2000.   The undisputed facts show that prior to obtaining the loans from Defendants, Hamilton was unaware that any Defendant had ever attempted to or collected a debt by extortionate means.   The undisputed facts show that Plaintiffs were unaware of any reputation by Defendants.   The only fact that Plaintiffs offer regarding their knowledge about Defendants' use of extortionate means prior to entering into the loans is Hamilton's declaration at paragraph 26.   In this paragraph, Hamilton states that before Loan Three was entered into, McClune told him that Willms had a short temper, that he could cause Hamilton serious trouble if he fell behind on payments, and not to get Willms mad at Hamilton.   See Hamilton Dec. at ¶ 26.   Plaintiffs offer no evidence as to what Hamilton thought or believed upon hearing these statements.

1    The court finds that there is insufficient evidence that at the time McClune made the

2    statements to Hamilton a person would have reasonably believed Willms had a reputation for

3    using extortionate means to collect loans.   At the time McClune's statements were made, they

4    were vague.   A reasonable person would presume from these statements that Willms would be

5    unwilling to negotiate for other arrangements and would foreclose if Hamilton did not timely

6    make payments on the loans.   There is no evidence as to the meaning Hamilton gave these

7    statements when they were made.   There is no evidence that Hamilton had other knowledge

8    about Willms that would indicate to a reasonable person that they meant something more than

9    Willms had a temper and Willms would exercise all legal options available to him if Hamilton

10   fell behind on payments.  While Plaintiffs allege in their opposition that Hamilton took these

11   statements as threats, Hamilton's declaration does not support this allegation.   Hamilton does

12   not state he felt threatened until paragraph 39 of Hamilton's declaration, when Willms began

13   threatening Hamilton after the loans were foreclosed.   Thus, based on the undisputed facts,

14   neither Hamilton nor any other Plaintiff reasonably believed that Willms had a reputation for the

15   use of extortionate means to collect loans or punish nonpayment at the time Loan One and Loan

16   Three were entered into.

17      Plaintiffs also offer no evidence that Westlake or any other person entered into loans with

18   Defendants believing that Defendants had collected or attempted to collect on other loans by

19   extortionate means or that Defendants had a reputation for the use of extortionate means to

20   collect loans and punish nonpayment.   Accordingly, the court cannot find Defendants' extension

21   of credit by extortionate means constituted a racketeering activity.

22   ***2.  Collection of an Extension of Credit by Extortionate Means***

23      As discussed above, racketeering activity includes any act indictable under certain

24   enumerated federal criminal statutes, including 18 U.S.C. § 894, which makes extortionate credit

25   collections a criminal offense.   Defendants contend that there is no evidence of a collection of

26   credit by extortionate means as to Defendants Dolly Willms, McClune, and Lend-Teck.   Title 18

27

28                                    31

U.S.C. § 894 prohibits the use of any extortionate means to collect or attempt to collect any extension of credit.   "An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person."   18 U.S.C. § 891(7).

There is no evidence that any Defendant, other than Willms, threatened Hamilton, any Plaintiff, or any other person.   While McClune was identified as Willms' "body guard," Plaintiffs cite to no evidence of express or implied threats of violence of criminal acts by McClune.   Thus, there is no evidence that any Defendant, other than Willms, committed a racketeering act by collecting a debt by extortionate means.

Defendants do not ask for summary judgment as to Willms regarding this act of racketeering.   While not referenced by Plaintiffs, if the court reviews Hamilton's declaration, it provides evidence that Willms threatened Hamilton when attempting to collect on debts.   After the properties were foreclosed, Willms insisted that Hamilton still owed him over $2 million. See Hamilton Dec. at ¶ 40.   Willms left threatening messages on Hamilton's answering machine.  Id. at ¶ 38.   Willms told Hamilton that the "boys back east" were not happy, and that he or the boys back east could cause Hamilton's legs to be broken.   See id. at ¶ 39.   Willms told Hamilton stories about threatening individuals with guns.   See id.  Hamilton took these threats seriously. Neither Plaintiffs' opposition nor Hamilton's declaration specifically tie the threats to the collection of a loan.   Because of this, the court could find Willms entitled to summary judgment because the evidence provided by Plaintiffs in this motion only shows threats; there is no evidence Willms threatened Hamilton regarding debts.   However, because the threats were made during the same time frame that Willms was contending Hamilton still owed him $2 million, an inference can be made that the threats pertained to the loans.   Thus, the court will find racketeering activity based on the threats made to Willms during 2001 and into 2002, which presumably concerned Willms' attempts to collects money Willms believed was outstanding on Loan One and Loan Three.

Case 1:02-cv-06583-AWI-SMS   Document 380   Filed 12/21/05   Page 33 of 37

1    If the court considers the declaration of Westlake, it also provides evidence of Willms'

2    attempts to collect an outstanding debt by extortionate means.   When Westlake did not pay off

3    his loan, Westlake declares that Willms threatened him, his wife, and neighbors.   See Westlake

4    Dec. at ¶ 8.  Westlake declares that Willms threatened physical harm, such as he knew how to

5    have legs broken.  See id.  Westlake declares that Willms stated that the "boys back east" would

6    harm Westlake.   See id. at ¶ 10.  Westlake declares that Westlake took the threats seriously.  See

7    id.  This evidence appears to support another racketeering act for the threats Willms made to

8    Westlake when attempting to collect on Westlake's outstanding loan.    However, as discussed

9    above, the court cannot consider this evidence because it is inconsistent with Westlake's

10   deposition and the inconsistency has not be explained.

11   Accordingly, the undisputed facts show that no Defendant other than Willms attempted to

12   collect loans by extortionate means, constituting a racketeering activity.   However, there is

13   evidence of racketeering acts by Willms in attempting to collect on loans by extortionate means.

14   ***3.  Mail Fraud***

15   Defendants contend that the undisputed facts do not show that they committed mail fraud.

16   As discussed above, racketeering activity includes any act indictable under certain enumerated

17   federal criminal statutes, including 18 U.S.C. § 1341, which makes mail fraud a criminal offense.

18   To prove a violation of mail fraud under Section 1341, "it is necessary to show that (1) the

19   defendants formed a scheme or artifice to defraud; (2) the defendants used the United States

20   mails or caused a use of the United States mails in furtherance of the scheme; and (3) the

21   defendants did so with the specific intent to deceive or defraud."  Miller v. Yokohama Tire

22   Corp.,  358 F.3d 616, 620 (9th Cir. 2004); Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.,

23   806 F.2d 1393, 1400 (9th Cir.1986).   The requirement of specific intent under this statute is

24   satisfied by "the existence of a scheme which was reasonably calculated to deceive persons of

25   ordinary prudence and comprehension, and this intention is shown by examining the scheme

26   itself."  Schreiber, 806 F.2d at 1401; United States v. Green, 745 F.2d 1205, 1207 (9th Cir.1985).

27

28   33

1   Plaintiffs only allegation regarding mail fraud in their opposition is that Defendants do

2   not contend they never used the mails to carry out the loans.   Plaintiffs offer evidence that

3   documents concerning Loan One and Loan Three were sent to Hamilton by McClune through the

4   mail.  See Hamilton Dec. ¶ 6 & 11.   Plaintiffs fail to allege, let alone provide evidence, of

5   Defendants' scheme or artifice to defraud.   It appears Plaintiffs may believe that by making the

6   loans Plaintiffs had some scheme or artifice to defraud Plaintiffs.   However, the details of this

7   scheme are a mystery.   Thus, the court cannot find the undisputed facts show an act of mail fraud

8   that can constitute racketeering activity.

9   *__4.  Wire Fraud__*

10   Racketeering activity can include any act "indictable" under 18 U.S.C. § 1343, which

11   relates to wire fraud.   Similar to mail fraud, "wire fraud violation consists of: (1) formation of a

12   scheme or artifice to defraud; (2) use of the United States wires or causing a use of the United

13   States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud."

14   Sebastian Intern., Inc. v. Russolillo, 186 F.Supp.2d 1055, 1066 (C.D. Cal. 2000) (citing

15   Schreiber, 806 F.2d at 1400).   Intent is satisfied by "the existence of a scheme which was

16   reasonably calculated to deceive persons of ordinary prudence and comprehension, and this

17   intention is shown by examining the scheme itself." Schreiber, 806 F.2d at 1401.

18   As with Plaintiffs' mail fraud theory, Plaintiffs' only allegation regarding wire fraud in

19   their opposition is that Defendants do not contend they never used the telephone to carry out

20   loans.  Plaintiffs offer evidence that the negotiations for the loans took place in person and over

21   the telephone.  See Hamilton Depo. ¶ 11 & 18.   Plaintiffs fail to allege, let alone provide

22   evidence, of Defendants' scheme or artifice to defraud.   It appears Plaintiffs believe that when

23   Willms negotiated the loans, he and the other Defendants had some scheme or artifice to defraud

24   Plaintiffs.   This scheme and the facts supporting this scheme are unknown.   Thus, the court

25   cannot find the evidence shows an act of wire fraud that can constitute racketeering activity.

26

27

28   34

**C. Pattern**

Defendants contend that Plaintiffs have no evidence of a pattern of racketeering activity. RICO violations under § 1962(c) require a "pattern of racketeering activity." 28 U.S.C. § 1962(c).  A "pattern of racketeering activity" requires "at least two acts of racketeering activity, one of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U .S.C. § 1961(5).  To constitute "a pattern", the defendant's conduct must be both related and continuous.  H.J. Inc. v. Northwester Bell Telephone Co., 492 U.S. 229, 239 (1989).  "Continuity is a both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  Id. at 241.

***1. Open-Ended Continuity***

Open-ended continuity refers to the threat that a defendant will continue to engage in criminal activity in the future.  H.J. Inc., 492 U.S. at 242.  A plaintiff can establish open-ended continuity by demonstrating that the defendant's predicate acts either "include a specific threat of repetition extending indefinitely into the future" or constitute the enterprise's "regular way of doing business."  Id.  Predicate acts that were neither isolated nor sporadic pose a threat of continuing activity.  Sun Savings & Loan Assoc. v. Dierdorff, 825 F.2d 187, 194 (9th Cir. 1987).

Here, Plaintiffs have provided insufficient facts to show open-ended continuity.  At best, Plaintiffs have provided evidence of three loans.  Defendants foreclosed on the property securing two of these loans.  When attempting to collect on the loans, Willms committed a racketeering act by using extortionate means to collect on the loans.  Plaintiffs provide no evidence that Willms or any other Defendant continue to commit racketeering acts.  Plaintiffs provide no evidence of racketeering acts since 2002.  There is no evidence from which an inference can be made that the way Willms attempted to collect on the loans made to Plaintiffs and Westlake represent Defendants' regular way of doing business.  As such, based on the evidence before the court, the court cannot find continuity based on a showing of open-ended continuity.

35

***2. Closed-Ended Continuity***

Closed-ended continuity is available when a defendant's predicate acts occurred over a substantial period of time. <u>Allwaste, Inc. v. Hecht</u>, 65 F.3d 1523, 1527 (9th Cir. 1995).  Although racketeering activities "extending over a few weeks or months" do not satisfy the substantial period of time requirement, there is no "bright line rule" regarding the amount of time required to show closed-ended continuity.  <u>Id</u>. at 1528.  Even though there is no "one year rule," courts rarely conclude closed-ended continuity exists when an alleged pattern of racketeering activity lasts less than one year.  <u>Religious Tech. Ctr. v. Wollersheim</u>, 971 F.2d 364, 366 (9th Cir.1992).  Flexibility rather than rigidity should govern determinations of "pattern," and thus factual inquiries are necessary.  <u>Allwaste</u>, 65 F.3d at 1528.

Taking the facts in the light most favorable to Plaintiffs, there is a disputed issue of fact on whether Willms committed acts that can constitute racketeering activity.   There is evidence Willms used extortionate means to collect on loans made to Plaintiffs after Defendants foreclosed on the property securing the loans.   Hamilton states that:  "The threats extended over many months starting in 2001 and carrying into 2002."  <u>See</u> Hamilton Dec. at ¶ 38.

Plaintiffs have provided evidence of racketeering activity.  However, the only evidence before the court is that the threats to Hamilton occurred for "many months" in the last half of 2001 and carrying into 2002.   Activity that lasts only a few months is simply not sufficiently continuous for closed-ended continuity. <u>See</u> <u>Howard v. America Online Inc.</u>, 208 F.3d 741, 750 (9th Cir. 2000).  Even viewing the facts in the light most favorable to Plaintiffs, the court concludes that the "many months" of "threats," which could constitute racketeering activity, does not constitute a "substantial period of time" sufficient to satisfy the closed-ended continuity requirement.   Because the only evidence is that Willms' threats occurred over the vague time span of "many months" and were directed at one victim, Plaintiffs have provided insufficient evidence of closed-ended continuity.   A pattern of activity lasting only a few months does not reflect the "long term criminal conduct" to which RICO was intended to apply.  <u>Religious Tech.</u>

1  Ctr. v. Wollersheim, 971 F.2d 364, 366-67 & n. 7 (9th Cir.1992) (collecting cases).

2      Even considering the Westlake declaration, the court cannot find a pattern.   Assuming

3  Westlake's declaration about threats made concerning outstanding loans is not a sham, there is

4  evidence that Willms used extortionate means to collect on a loan from Westlake.    However,

5  Plaintiffs have provided no evidence on when Willms conducted this possible act of racketeering

6  against Westlake.   Without knowing the time frame of this alleged act of racketeering, threats to

7  Westlake cannot expand the term of criminal conduct to a sufficiently long period of time to

8  satisfy closed-ended continuity.

9      Accordingly, Defendants are entitled to summary judgment because, even making all

10  inferences in Plaintiff's favor, Plaintiffs do not have sufficient evidence to establish a pattern of

11  racketeering activity.

12                              **ORDER**

13      Accordingly, based on the above memorandum opinion, the court ORDERS that:

14  1.   Defendants' motion to strike the late opposition is DENIED;

15  2.   Defendants' motion to strike the second opposition in response to Defendants' reply is

16      DENIED;

17  3.   Defendants' motions to strike the Hamilton Declaration, Nawab Declaration, and portions

18      of the Westlake Declaration are DENIED as unnecessary;

19  4.   Defendants' motion to strike the Westlake Declaration is GRANTED to the extent

20      Westlake describes threats concerning outstanding loans, and this portion of the Westlake

21      Declaration is STRICKEN;

22  5.   Plaintiffs' motion to continue the motion for summary judgment pursuant to Rule 56(f) is

23      DENIED;

24  6.   Defendants' motion for summary judgment on the first claim for relief is GRANTED.

25  IT IS SO ORDERED.

26  **Dated:    December 21, 2005**          **/s/ Anthony W. Ishii**
    0m8i78                              UNITED STATES DISTRICT JUDGE

27

28                          37